621 F.2d 294
 104 L.R.R.M. (BNA) 2306, 88 Lab.Cas. P 12,076
 IRVIN H. WHITEHOUSE & SONS COMPANY, Appellant,
v.
LOCAL UNION 214 OF SIOUX CITY, IOWA, INTERNATIONAL
BROTHERHOOD OF PAINTERS AND ALLIED TRADES,
AFL-CIO, and The Joint Trade Board of
Sioux City, Appellees.
 No. 79-1638.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 13, 1980.
Decided May 5, 1980.
 
 Laurence J. Zielke, Zielke, Davidson, Taft & Risch, Louisville, Ky., for appellant.
 MacDonald Smith, Sioux City, Iowa, argued for appellees; Harry H. Smith, Sioux City, Iowa, on brief.
 Before LAY, Chief Judge, and BRIGHT and HENLEY, Circuit Judges.
 HENLEY, Circuit Judge.
 
 
 1
 This is an appeal from a judgment of the United States District Court for the Northern District of Iowa dismissing a complaint for declaratory and injunctive relief. The case arises out of a labor dispute between plaintiff, Irvin H. Whitehouse & Sons Company, a Kentucky corporation, and the defendant, Local Union 214 of Sioux City, Iowa, International Brotherhood of Painters and Allied Trades, AFL-CIO, hereinafter called Local 214 or the local union. Another defendant is The Joint Trade Board of Sioux City, Iowa (Board or Joint Board) established by Article VII of an overall collective bargaining agreement between the Sioux City Chapter of the Painting and Decorating Contractors of America (PDCA), and Local 214.
 
 
 2
 District court jurisdiction was properly based on § 301(a) of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185(a). See also 28 U.S.C. §§ 1331(a) and 1337.
 
 
 3
 The suit was filed in 1978. In January, 1979 it was the subject of a bench trial. On June 29 the district judge filed a memorandum opinion setting out his findings of fact and conclusions of law. He determined that plaintiff was not entitled to any relief. A final judgment dismissing the complaint having been entered, this appeal was taken.
 
 
 4
 The "Sioux City area" referred to in the record consists of Woodbury County, Iowa, wherein Sioux City is located, and a number of other counties in western Iowa and eastern Nebraska. Large scale painting contractors in the area are members of the Sioux City Chapter of the Painting and Decorating Contractors of America; individual painters in the area are represented for collective bargaining purposes by Local 214.
 
 
 5
 The collective bargaining agreement that we have mentioned was executed in 1977. It did not contain the now common no strike-no lockout clause, and it did not contain a provision for binding arbitration of an unsettled dispute by an outside arbitrator. Such complementing provisions are now favorites of federal labor law. See Barrentine v. Arkansas-Best Freight System, Inc., 615 F.2d 1194 (8th Cir. 1980), and cases cited.
 
 
 6
 Article VII of the contract did set out a grievance procedure with resort to arbitration by the Joint Board at the option of either party to a labor dispute but with the Board being required to come to a decision within forty-eight hours after the submission of the complaint. At this point we set out in full the relevant provisions of Article VII.
 
 
 7
 Section 1. (a) The parties hereto agree that during the term of this Agreement there shall be a standing Joint Trade Board composed of 3 representatives designated by the Chapter and 3 representatives designated by the Union, one of whom shall be elected Secretary, one of whom shall be elected Chairman, of said Board. Each member of the Board, including the Chairman and Secretary, shall have one vote on all matters.
 
 
 8
 (b) These Representatives designated by the Chapter shall not be more than One per shop if at all possible. These Representatives designated by the Union shall not be more than one employee per shop if at all possible.
 
 
 9
 Section 2. (a) To the Joint Trade Board shall be referred all disputes and matter of controversy arising under the provisions of this Agreement. (b) Any party to this Agreement may, by appeal from the decision of either party hereto, request a hearing of the matter in dispute by the Joint Trade Board and such Joint Trade Board shall thereupon proceed to hearing and decision of such matter.
 
 
 10
 Section 3. In case of disputes, every effort shall be made to settle same by the parties concerned. The Business Representative or the Steward shall assist in settling of disputes if requested to do so. If no settlement can be made within a reasonable time, either party may submit the dispute to the Joint Trade Board.
 
 
 11
 The Joint Trade Board, by a majority vote of all of its members, may decide matters or disputes submitted hereunder which involve the interpretation, application or adherence to the terms of this Agreement and such decisions and the remedy set by the Board shall be binding and final on the parties to such matters or disputes. If no decision is forthcoming within 48 hours after complaint is made, both parties after this procedure is complied with and the dispute still exists, both parties are free to take whatever action is necessary to resolve same. Before the Union takes strike action under this section, the affected parties shall be given at least 12 hours written notice by registered mail or telegram. Employer to have equal right for action.
 
 
 12
 The agreement contained provisions governing rates of pay, hours of work, and working conditions, and Article X provided, among other things, for travel pay for individual workers under certain conditions.
 
 
 13
 The agreement was binding on all members of the Sioux City Chapter of PDCA, and it was also binding on contractors who were members of Chapters of the PDCA other than the Sioux City Chapter and who obtained painting contracts or subcontracts within the Sioux City area.
 
 
 14
 In 1975 a number of public utility companies entered into a joint venture for the construction of a power plant at Neal Station in Woodbury County. A corporation known as Ebasco Services, Inc. became the agent of the owners and seems to have been the prime contractor with respect to the project, which naturally involved large scale industrial painting.
 
 
 15
 In June, 1975 Ebasco entered into a Memorandum of Understanding with craft labor unions, including Local 214, the members of which would be working on the Neal Station job. The memorandum was designed to insure labor peace on the project, and it contained a grievance procedure including final and binding arbitration by an outside arbitrator. We set out relevant provisions of that contract:
 
 INTENT
 
 16
 We intend by this document to provide close cooperation between Management and Labor for the express purpose of completing the construction of this project economically without delays or work stoppages. It is the desire of both parties to resolve any differences on the job at a local level. It being the specific intent of both parties that the following articles are adhered to:
 
 ARTICLE I
 No Strike, No Lock-out
 
 17
 (a) There shall be no lock-outs by the Employers and the Unions agree that there shall be no strikes, work stoppages or slow down of work for any reason except as provided for in paragraph (c) of this Article.
 
 
 18
 (b) The Unions shall not recognize or support any work stoppage or picket line caused by any Union. This no strike, no lock-out commitment is based upon the agreement by both parties to be bound by the grievance and arbitration provisions of Article III and the jurisdictional dispute procedure authorized under Article II of this agreement.ARTICLE III
 
 Grievance and Arbitration
 
 19
 (a) It is specifically agreed that there shall be no strikes, lock-outs, or cessation or slow down of work or picketing over any dispute. All grievances and disputes, excluding Jurisdictional Disputes, shall be handled as hereinafter provided. No such grievance shall be recognized unless called to the attention of the Employer by the Union, or to the attention of the Union by the Employer within five (5) days after the alleged violation was committed.
 
 
 20
 (b) Grievances shall be settled according to the following procedure:
 
 
 21
 Step 1. The dispute shall be adjusted by the Steward, Representative and/or Business Manager of the Union involved and the Employer's Representative at the construction project or his designated representative.
 
 
 22
 Step 2. In the event that the Business Manager and/or the Representative of the Union and the Representative of the Employer cannot reach agreement within five (5) days after a meeting is arranged and held, the matter shall be referred to the General President of the respective National Union and he or his representative shall meet with the home office representative of the Employer, and jointly take steps to ascertain the facts and render a decision thereon.
 
 
 23
 Step 3. In the event that the representative of the Union and the home office representative of the Employer are unable to resolve this dispute within seven (7) days, the appropriate final and binding arbitration procedure of the applicable National or Local Agreement (whichever the Employer is working under) shall govern. In the event there is no final and binding arbitration procedure in the applicable Local or National Agreement, then the parties shall choose a mutually agreed upon arbitrator for final and binding arbitration. Cost of the arbitrator shall be borne equally by the Union and Employer.
 
 ARTICLE V
 Purpose
 
 24
 This Memorandum of Understanding is entered into to insure that the work may proceed without stoppages, and the construction may be a credit to the Building Trades Unions and the Contractors. It is recognized by all parties that harmonious labor-management relations are the result of a responsible relationship between the Building and Construction Trades Unions and the Contractors employing Building and Construction Tradesmen, and it is our mutual desire to promote this relationship during the course of construction of this Project as an expression of responsibility and good faith toward the owners and the community. Therefore, the parties signatory to this Understanding will participate in regular monthly meetings. The meetings will be scheduled by the Regional Director of the Building & Construction Trades Department.
 
 
 25
 This Agreement shall take effect on June 26, 1975 and shall remain in force and effect for this Project until its completion. This Agreement may be amended only by written agreement signed by both parties.
 
 
 26
 Plaintiff is a member of the Louisville, Kentucky Chapter of PDCA. In January, 1978 it entered into a subcontract with Ebasco covering certain painting work to be done at the Neal Station project. In so doing plaintiff became bound by the underlying agreement between the Sioux City Chapter, PDCA, and Local 214. It was also covered by the 1975 Memorandum of Understanding that has been mentioned.
 
 
 27
 A dispute promptly arose between plaintiff and Local 214 as to the entitlement of certain painters to travel pay under the collective bargaining agreement. The parties were unable to settle the dispute. With affairs at that stage, plaintiff demanded outside arbitration as provided by Article III of the Memorandum of Understanding. The union refused that demand and referred the dispute to the Joint Board. The Board assumed jurisdiction, but plaintiff refused to participate in proceedings before the Board, which resolved the controversy in favor of the union.
 
 
 28
 Plaintiff then commenced this action in the district court seeking a declaratory judgment to the effect that the union had breached its collective bargaining obligation by refusing to agree to outside arbitration. Plaintiff also sought appropriate injunctive relief against both Local 214 and the Joint Board. The defendants denied that plaintiff was entitled to any relief.
 
 
 29
 The district court found that the case involved no substantial factual dispute, although, of course, there was a dispute about how the two contracts that we have mentioned should be construed and applied to the facts of the case.
 
 
 30
 The district court determined that the two contract documents had to be read together, and that when so read a dispute arising under the collective bargaining agreement and not settled had to be referred to the Joint Board but without regard to the optional or permissive character of Article VII of the collective bargaining agreement and with the forty-eight hour time for decision limitation appearing in that Article being eliminated.
 
 
 31
 We do not agree.
 
 
 32
 First, we observe that the case does not involve conflicting evidence presenting witness credibility problems better to be resolved by a trial court rather than by an appellate court. See Fed.R.Civ.P. 52(a). The case involves the construction and application of two written instruments considered in the light of undisputed facts. Thus, we have more leeway in review than we might have in a case of another type. See, e. g., Gay Lib v. University of Missouri, 558 F.2d 848, 853, n. 10 (8th Cir. 1977), cert. denied, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 789 (1978). Nor does the case involve an open or doubtful question of state law with respect to which the view of the district judge would be entitled to particular weight. Wyatt v. United States, 610 F.2d 545 (8th Cir. 1979); American Motorists Ins. Co. v. Samson, 596 F.2d 804 (8th Cir. 1979), and cases cited.
 
 
 33
 To proceed, we have already indicated relevant differences in the grievance and arbitration procedures set out in the collective bargaining agreement and in the Memorandum of Understanding. We observe that the collective bargaining agreement was of general application throughout the Sioux City area whereas the Memorandum of Understanding was an ad hoc agreement entered into between Ebasco, on one hand, and a number of labor unions, including Local 214, on the other hand, and was designed specifically to avoid work stoppages in connection with the Neal Station project. We also observe that the Memorandum of Understanding was not limited in application to painting contractors and Local 214. A strike or lockout involving any of the employers or unions working on the Neal Station project could affect adversely not only the immediate parties to the labor dispute in question but also the owners of the projected plant, Ebasco, and other local unions and subcontractors engaged in the performance of work on the project.
 
 
 34
 What the district court did was to so meld the contract documents as to subject both plaintiff and Local 214 to "joint board" arbitration as opposed to "outside arbitration." We think that the result reached was unwarranted in the circumstances of this case.
 
 
 35
 As stated, federal labor policy strongly favors arbitration as a means of settling labor disputes where the parties cannot settle their differences amicably or at early stages of the grievance procedures ordinarily contained in collective bargaining agreements. From the standpoint of the parties involved and of the general public arbitration is a method of settling disputes in the field of labor relations that is much preferable to strikes or lockouts.
 
 
 36
 Arbitration commonly involves use of an outside arbitrator who has no direct connection with either party to the labor dispute under consideration. Some collective bargaining contracts, however, notably some of those to which local unions affiliated with what is generally called the Teamsters Union are parties, provide for arbitration by joint boards made up of representatives of both management and labor with some precautions being taken in the interest of impartiality to regulate the consists of particular joint boards or committees.
 
 
 37
 While joint board arbitration is legal, and the decisions of joint boards are binding on the parties, Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964), General Drivers Warehousemen & Helpers Union No. 85 v. Riss & Co., Inc., 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); Barrentine v. Arkansas-Best Freight System, supra, such arbitration may be "subject to grave abuses, including, notably, collusive secret agreements between employers and unions as a result of which the interests of individual employee grievants may be sacrificed to arrangements that management and union labor may consider to be in their own broader interests." Barrentine, supra, 615 F.2d p. 1201. Because of the possibility of such abuses, the joint board type of arbitration has been criticized. See General Drivers and Helpers Union, Local 554 v. Young and Hay Transp. Co., 522 F.2d 562, 567, n.5 (8th Cir. 1975); Feller, "A General Theory of the Collective Bargaining Agreement," 61 Cal.L.Rev. 663, 836-38 (1973); Azoff, "Joint Committees As An Alternative Form of Arbitration Under The NLRA," 47 Tul.L.Rev. 325 (1973).
 
 
 38
 The problem has arisen most frequently in cases of grievances filed by individual employees and submitted to joint boards made up of representatives of management and labor. In that situation the interests of the individual grievant may be ignored on the basis of a collusive side arrangement between management and the labor union that owes to the grievant a duty of fair representation. Barrentine, supra, raised that problem.
 
 
 39
 It occurs to us that the converse of the situation just outlined is presented where an out of state contractor is required to submit his dispute to a joint board made up of local contractors and representatives of the local labor union with which the contractor in question is in dispute.
 
 
 40
 Had plaintiff come from Kentucky into Iowa on a job other than the Neal Station project, it would have been bound by the grievance, joint board arbitration procedures spelled out in Article VII of the basic collective bargaining agreement. And, with respect to the Neal Station job plaintiff was bound by the substantive terms of the collective bargaining agreement, including the travel pay provisions of that agreement. But, with respect to the Neal Station job we are satisfied that plaintiff was entitled to the benefit of the outside arbitrator provision of the Memorandum of Understanding, and that the trial court erred in holding otherwise.
 
 
 41
 We reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion. On remand the district court may consider changes in conditions and needs brought about by the passage of time. Fundamentally, however, the district court will proceed on the premise that plaintiff was entitled, and to the extent needed still is entitled to outside arbitration as provided by the Memorandum of Understanding.
 
 
 42
 Reversed and remanded.